## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

LISA MARIE KERR,

                Plaintiff,

v.                                                          CIVIL ACTION NO.   2:20-cv-00190

SHANNON McKAY, et al.,

                Defendants.


### PROPOSED FINDINGS & RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).   (ECF No. 2.)   Before this Court are the motions to dismiss filed by Defendants West Virginia Department of Health and Human Resources ("WVDHHR") (ECF No. 3), Lance Whaley ("Whaley") (ECF No. 6), and Shannon McKay ("McKay") (ECF No. 9) (collectively, "Defendants").   For the reasons explained more fully herein, the undersigned respectfully **RECOMMENDS** that Defendants' motions (ECF Nos. 3, 6, 9) be **GRANTED IN PART** and **DENIED IN PART**.

### I.    BACKGROUND

Plaintiff Lisa Marie Kerr ("Plaintiff"), who describes herself as "a non-gender-conforming lesbian," alleges that she "is employed as a Social Service Worker II in the Adult Services department of [WVDHHR's] Lincoln County office."   (ECF No. 1-2 at 6.) She avers that McKay "is the Community Service Manager" of that office, and Whaley, McKay's "superior," "is the Regional Supervisor for [WVDHHR] in District II."   (*Id.* at

6–7.)  Plaintiff avers that on March 26, 2019, she requested that a supervisor deal with two co-workers whom Plaintiff "caught sneaking off" with a state vehicle that Plaintiff "had signed out to transport a client." (*Id.* at 9.)  She alleges that another co-worker paged McKay, and when McKay arrived, she "immediately—and incorrectly—assumed that [Plaintiff] was the wrongdoer, rather than the victim, because of her bias against [Plaintiff] as a lesbian who does not conform to traditional feminine gender norms." (*Id.* at 9–10.)  According to Plaintiff, when she tried to explain the situation to McKay, McKay shouted at her and told her that she was "being 'aggressive.'" (*Id.* at 10.)  Plaintiff alleges that when she asked McKay how to report her co-workers who had used the vehicle Plaintiff had signed out, McKay demonstrated "a statement made with every type of exaggerated feminine gesture and wording one might imagine." (*Id.*)  Plaintiff avers that she then accused McKay of being biased against her because she was "not as feminine as the other workers," and McKay "punished" her by forcing her to go home and use a day of annual leave. (*Id.* at 10–11.)

That same day, Plaintiff alleges, she filed a Level I grievance against McKay arising from the incident, in which she claimed unlawful sex discrimination and retaliation. (*Id.*)  Plaintiff avers that on April 3, 2019, WVDHHR's "internal EEO investigator," Carlotta Gee ("Gee"), contacted Plaintiff, McKay, and other employees to schedule interviews for an internal "EEO investigation." (*Id.* at 11, 13.)  According to Plaintiff, she also received a "pre-determination" letter from McKay that day, which "accused [Plaintiff] of wrongdoing in the same incident on which [her] Title VII grievance was based, and asked her to attend a conference." (*Id.* at 11.)  Plaintiff alleges that at the April 10, 2019 conference, McKay and Whaley "falsely accused [her] of being thrown out of CAMC Hospital" and the Lincoln County Courthouse. (*Id.* at 11–12.)  Plaintiff further

alleges that when she asked McKay and Whaley "for the source and details of the accusations," McKay refused to tell her.   She avers that her direct supervisor, Julia Morton ("Morton"), was present "and seemed flustered by the attacks on [Plaintiff]." According to Plaintiff, Morton encouraged her to "just admit it and we can get this over with."   (*Id*. at 12.)   Plaintiff alleges that "Whaley then leaned forward and spoke in a lowered tone: 'I don't have that EEO report, so I don't know what it says, Lisa.   But let's say DHHR puts out a report that says you go around committing violence and threats everywhere you go.   Wouldn't that mean we're right about this violence stuff?   Wouldn't you have to admit there's something to it?"   (*Id*.)   Plaintiff avers that she "denied all of the accusations."   (*Id*.)

Plaintiff alleges that more than a month later, on May 31, 2019, McKay "stormed into [Plaintiff's] office with another supervisor (Jennifer Beckett [("Beckett")]) in tow" after Plaintiff "(unavoidably) arrived late at an 'active shooter training[]' [conducted by the West Virginia State Police ("WVSP")], asked a few questions, and excused herself." (*Id*.)   According to Plaintiff, McKay appeared "[v]isibly confrontational" and "claimed (while Beckett stood silent) that '[WVSP] are never sending anyone to DHHR again, in the whole state, because of you screaming and threatening and bullying that police officer in there.'"   (*Id*.)   Plaintiff avers that she "had no idea what McKay was talking about," so she "quietly told McKay that she had no choice but to report this to the grievance board as an additional incident of retaliation."   (*Id*.)   She alleges that McKay then accused Plaintiff of threatening her.   (*Id*.)   According to Plaintiff, "McKay did not attend the training, and thus could not have witnessed what she claimed to describe," and Beckett, who did attend the training, "did not support McKay's wild accusations."   (*Id*.)   Plaintiff

alleges that McKay issued another "pre-determination" letter stemming from the active shooter training. (*Id.*)

Plaintiff avers that on June 6, 2019, Gee wrote a letter stating that WVDHHR determined after its internal investigation that "a complaint" of sexual orientation discrimination was not substantiated, but the letter "did not mention [Plaintiff's] actual complaint for sex/gender bias and retaliation," nor did it "call [Plaintiff] an 'aggressor'" or "describe any conduct by [her]." (*Id.* at 13.) However, Plaintiff alleges, the letter included a statement of WVDHHR's zero-tolerance retaliation policy. (*Id.*)

She further alleges that the next day, on June 7, 2019, she attended a conference related to the active shooter training incident, at which McKay and Whaley informed her that WVSP "filed an official complaint" against her "but refused to provide the complaint itself, or any details." (*Id.* at 12.) She claims that "the second meeting went like the first: Whaley threatened that an EEO investigation would find [Plaintiff] to be 'violent,' McKay became irate when asked for details about anything, and [Plaintiff's] inexperienced supervisor Morton offered no corroboration, but begged [Plaintiff] to admit everything so that they could leave." (*Id.* at 12–13.) Plaintiff avers that she offered to apologize to the officer for arriving at the training late and leaving early, but McKay "became furious, panicked and defensive" and "shouted" at Plaintiff to not contact WVSP or "question anything I say ever again." (*Id.* at 13.) According to Plaintiff, "McKay then called in Beckett" and "tried to coach [her] into saying that [Plaintiff] 'waved her fists in the officer's face' and threatened violence" at the training, but Beckett confirmed Plaintiff's statements about what happened. (*Id.*) Plaintiff claims that she asked McKay "to stop with this fist thing now" and made a "pleading" gesture with her hands, but "McKay

4

joyously cried out" that Plaintiff was "putting her fists up in a boxing stance." (*Id.*) Plaintiff avers that Beckett "roll[ed] her eyes" and left the room. (*Id.*)

According to Plaintiff, "McKay finally made herself available for a Level I grievance hearing" on August 20, 2019. (*Id.*) Plaintiff alleges that McKay "invented a tale of [Plaintiff] rampaging through the DHHR parking lot, chasing women around cars, and brandishing her fists 'like a boxer,'" and "claim[ed] that everyone at DHHR was so frightened of [Plaintiff] that they asked McKay to call 911 and change the locks so that [Plaintiff] could not re-enter the building." (*Id.* at 13–14.) Plaintiff further alleges that McKay admitted upon cross-examination that she did not witness the incident in the parking lot but "claimed that her story was supported by four witnesses." (*Id.*) According to Plaintiff, McKay "could only produce two" witnesses, and neither witness's testimony supported McKay's version of events. (*Id.* at 14.) Plaintiff avers that one witness "testified that the idea to call 911 and change locks came from McKay, not from anyone else," but the witness did not follow McKay's directions "because she did not see any reason for it." (*Id.*) Plaintiff alleges that she then became "terrified that McKay would call 911 on her, falsely claim she was rampaging like a boxer, and get her shot dead," which caused her to have a panic attack at work the following day and use prescription anti-anxiety medication "for nearly a week." (*Id.*) She claims that she "still has tremors whenever she sees McKay, and leaves the room when possible," that she "is afraid to speak when McKay is in the vicinity," and that she "stuffs her hands in her pockets so that McKay will not make the delusional claim that [she] is using 'boxing' moves or 'fist' gestures." (*Id.*)

On August 28, 2019, Plaintiff had a performance review with Morton, and Morton rated her performance as "meets expectations" or "exceeds expectations" in every area

except one: Morton rated Plaintiff's performance as "needs improvement" in the area of "Works well with others to achieve organization's goals." (*Id.* at 32–37.) McKay reviewed and initialed the review before it was presented to Plaintiff. (*Id.* at 37.) Plaintiff wrote a response to the review in which she stated that she "strongly disagrees that she has problems dealing with outside agencies" and attributed her "problem" to McKay, whom she stated "is a liar" and "is biased against LGBT people." (*Id.* at 38.)

Plaintiff alleges that the following day, "McKay and Whaley called [Plaintiff] into McKay's office" and presented her with a letter notifying her that she would be suspended without pay for two weeks. (*Id.* at 14; *see id.* at 27–31.) She avers that Whaley told her that the suspension was based on a report from the internal EEO investigation, which included statements from interviews with Plaintiff's co-workers that she was "violent and aggressive and threatening and they can't stand to be around [her]." (*Id.* at 14–15.) Plaintiff claims that when she asked to see the report, Whaley refused to provide it because it was "confidential" and "taunted" her that "it's bad." (*Id.* at 15.) The letter explained that Plaintiff was being suspended because of the parking lot and active shooter training incidents and "corrective action" in the form of a November 5, 2018 "EPA3" document and conversations that occurred on February 22, 2019, and April 19, 2019. (*Id.* at 28–29.) It was signed by Whaley, and a copy was provided to McKay and to the "WV Division of Personnel" and placed in an administrative file and in Plaintiff's personnel file. (*Id.* at 31.) Plaintiff avers that "[n]one of the conduct for which [she] was suspended ever occurred." (*Id.* at 15.)

The following day, Plaintiff alleges, she "upgraded her grievance to Level III based on the two-week suspension without pay" and filed a charge with the federal Equal Employment Opportunity Commission ("EEOC") against WVDHHR, Whaley, and McKay

that alleged sex discrimination and retaliation. (*Id*.) Plaintiff claims that WVDHHR "refused to produce evidence in the grievance process" until an administrative law judge directed it to do so, and when Plaintiff reviewed the evidence that was produced, "*zero* allegations in the Suspension Letter were supported." (*Id*. at 16 (emphasis in original).) She alleges that the letter "was and is a fabric of lies" that Whaley and McKay "created to retaliate against [her] for pursuing a sex/gender bias complaint." (*Id*.)

Plaintiff brings claims for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., defamation under West Virginia law, and violation of her due process rights under 42 U.S.C. §§ 1983 and 1985(3). (*Id*. at 9–24.) She requests $3 million in damages, "inclusive of back/front pay, compensatory damages, pain and suffering damages, and punitive damages." (*Id*. at 25.)

WVDHHR filed its motion to dismiss on March 24, 2020. (ECF No. 3.) Plaintiff timely responded (ECF No. 12), and WVDHHR timely replied (ECF No. 15). Whaley also filed his motion to dismiss on March 24, 2020. (ECF No. 6.) Plaintiff timely responded (ECF No. 13), and Whaley timely replied (ECF No. 14). McKay filed her motion to dismiss on April 9, 2020. (ECF No. 9.) Plaintiff timely responded (ECF No. 16), and McKay timely replied (ECF No. 17). As such, the motions to dismiss are fully briefed and ready for resolution.

## II.    *LEGAL STANDARD*

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see McCleary-Evans v. Md. Dep't of Transp., State Highway Admin*., 780 F.3d 582, 585 (4th Cir. 2015) (stating that this requirement exists "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007))).   However, to withstand a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6),[1] a complaint must plead enough facts "to state a claim to relief that is plausible on its face."   *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678.   Stated another way, the factual allegations in the complaint "must be sufficient 'to raise a right to relief above the speculative level.'"   *Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555).   A complaint that alleges enough facts "to satisfy the elements of a cause of action created by [the relevant] statute" will survive a motion to dismiss.   *Id.* at 648 (quoting *McCleary-Evans*, 780 F.3d at 585).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."   *Iqbal*, 556 U.S. at 679.   This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief."   *Id.*   Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense."   *Id.* "[T]o satisfy the plausibility standard, a plaintiff is not required to plead factual allegations in great detail, but the allegations must contain sufficient factual heft to allow a court, drawing on judicial experience and common sense, to infer more than the mere

---

[1] McKay's motion to dismiss for failure to state a claim, because it was filed after her answer was filed, is properly construed as a motion for judgment on the pleadings made pursuant to Federal Rule of Civil Procedure 12(c).   *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002).   However, the standard applicable to such a motion is identical to that this Court applies when ruling on a Rule 12(b)(6) motion to dismiss.   *Id.* at 405–06.

possibility of that which is alleged." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (internal quotation marks omitted).

III.    ANALYSIS

A. *WVDHHR's Motion to Dismiss (ECF No. 3)*

1. *Title VII Claims*

WVDHHR argues that it is entitled to qualified immunity as to Plaintiff's Title VII claims. (ECF No. 4 at 5–8.) However, "there is no qualified immunity from liability under Title VII." *Cutts v. Peed*, 17 F. App'x 132, 136–37 (4th Cir. 2001) (per curiam) (citing *Genas v. N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 829 n.3 (2d Cir. 1996); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991); *Harvey v. Blake*, 913 F.2d 226, 228 (5th Cir. 1990)). This is because "individuals are not subject to liability under [Title VII]," *Scott v. Md. State Dep't of Labor*, 673 F. App'x 299, 307–08 (4th Cir. 2016) (per curiam) (citing *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180–81 (4th Cir. 1998)), and "[q]ualified immunity may be invoked [only] by a government official sued in his personal, or individual, capacity," *Ripdath v. Bd. of Governors*, 447 F.3d 292, 306 (4th Cir. 2006). Therefore, because WVDHHR is an entity, and not an individual, it cannot assert a federal qualified immunity defense. *Ripdath*, 447 F.3d at 306 ("[Qualified immunity] is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent."). And to the extent WVDDHR seeks to assert qualified immunity under West Virginia law, state-law immunities do not shield a defendant from liability for a federal cause of action. *See Martinez v. California*, 444 U.S. 277, 284 (1980). Accordingly, the undersigned **FINDS** that WVDHHR is not entitled to qualified immunity as to Plaintiff's Title VII claims against it and respectfully **RECOMMENDS** that its motion to dismiss (ECF No. 3) be **DENIED** as to those claims.

9

2. *Defamation Claim*

WVDHHR next argues that it is entitled to state sovereign immunity as to Plaintiff's defamation claim.   (ECF No. 4 at 8–9.)   The West Virginia Constitution provides that "the State of West Virginia shall never be made a defendant in any court of law or equity."   W. Va. Const. art. VI, § 35.   The principle applies equally to state agencies like WVDHHR.   Syl. Pt. 8, *Bland v. State*, 737 S.E.2d 291 (W. Va. 2012) ("The constitutional immunity of the state from suit extends to its governmental agencies."); *Shaffer v. Stanley*, 593 S.E.2d 629, 639 (W. Va. 2003) ("The DHHR is an agency of the State . . . ." (citing W. Va. Code § 9-2-1a)).   In general, "where monetary relief is sought against the State treasury for which a proper legislative appropriation has not been made, sovereign immunity raises a bar to suit."   *Arnold Agency v. W. Va. Lottery Comm'n*, 526 S.E.2d 814, 821 (W. Va. 1999) (citing *Mellon-Stuart Co. v. Hall*, 359 S.E.2d 124, 129 (1987)).

However, "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State."   Syl. Pt. 4, *W. Va. Lottery v. A-1 Amusement, Inc.*, 807 S.E.2d 760 (W. Va. 2017) (quoting Syl. Pt. 2, *Pittsburgh Elevator Co. v. W. Va. Bd. of Regents*, 310 S.E.2d 675 (W. Va. 1983)); *see* W. Va. Code § 29-12-5(a)(4) ("Any policy of insurance purchased or contracted by the board shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits" for incidents covered by the policy's terms.).   In such cases, the complaint must expressly "limit[] the relief sought to the coverage actually provided by the applicable insurance policies."   *Parkulo v. W. Va. Bd. of Probation & Parole*, 483 S.E.2d 507, 515 (W. Va. 1996); *see* Syl.

10

Pt. 5, *A-1 Amusement, Inc.*, 807 S.E.2d 760 ("In the future, this Court will not review suits against the State brought under the authority of W. Va. Code § 29-12-5 unless it is alleged that the recovery sought is limited to the applicable insurance coverage and the scope of the coverage and its exceptions are apparent from the record." (quoting Syl. Pt. 3, *Parkulo*, 483 S.E.2d 507)).

Here, Plaintiff seeks $3 million in damages, but nowhere in her complaint does she limit her requested recovery to an insurance policy issued to WVDHHR that would cover her defamation claim against it.   (ECF No. 1-2 at 6, 25–26.)   As such, the undersigned **FINDS** that WVDHHR is entitled to state constitutional immunity as to that claim and respectfully **RECOMMENDS** that WVDHHR's motion to dismiss (ECF No. 3) be **GRANTED** as to Plaintiff's defamation claim against it.

Plaintiff argues that WVDHHR has waived its immunity "by consenting to removal of [this] action to federal court."   (ECF No. 12 at 7.)   In doing so, Plaintiff appears to conflate the constitutional immunity in article VI, section 35 of the West Virginia Constitution with the Eleventh Amendment immunity derived from the federal Constitution.   But these concepts are distinguishable: "Eleventh Amendment immunity is but an example of state sovereign immunity as it applies to suits filed in federal court against unconsenting states by citizens of other states."   *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005).   "[W]here a state retains its sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court." *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019) (citing *Stewart*, 393 F.3d at 490). As the undersigned has just explained, WVDHHR has not waived its constitutional immunity to suit as to Plaintiff's defamation claim against it.   Therefore, it retains that immunity despite its consent to removal of this action to federal court.   *Id.*

### 3. *42 U.S.C. §§ 1983 and 1985(3) Claims*

WVDHHR argues that as a state agency, it is not a "person" that may be sued under 42 U.S.C. § 1983. (ECF No. 4 at 9–10.)[2] Indeed, § 1983 "creates a cause of action against any *person* who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Hensley* ex rel. *North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)) (emphasis supplied). The statutory term "person" does not "include the sovereign for purposes of determining who may be sued." *Va. Office for Prot. & Advocacy v. Reinhard*, 405 F.3d 185, 190 (4th Cir. 2005) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989)). That is, "states, state agencies, and state officials sued in an official capacity cannot be sued for damages under § 1983." *Spry v. West Virginia*, No. 2:16-cv-01785, 2017 WL 440733, at *13 (S.D.W. Va. Feb. 1, 2017) (citing *Will*, 491 U.S. at 71). The undersigned **FINDS** that because WVDHHR is a state agency, no § 1983 claim lies against it, and thus **RECOMMENDS** that WVDHHR's motion to dismiss (ECF No. 3) be **GRANTED** as to that claim. *See Frederick v. W. Va. Dep't of Health & Human Servs.*, No. 2:18-cv-01077, 2019 WL 1198027, at *18 (S.D.W. Va. Feb. 15, 2019) (concluding that WVDHHR not amenable to suit under § 1983), *adopted by* 2019 WL 1173358 (S.D.W. Va. Mar. 13, 2019).

WVDHHR also argues for the dismissal of Plaintiff's 42 U.S.C. § 1985(3) claim against it because an alleged Title VII violation cannot be the source of such a claim.

---

2 Plaintiff does not respond to this argument in her response in opposition to WVDHHR's motion to dismiss. (ECF No. 12.) As such, she appears to concede the point. *Morgan v. Logan Cty. Comm'n*, No. 2:18-cv-01450, 2019 WL 1748534, at *5 (S.D.W. Va. Apr. 18, 2019) (citing *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004); *Blankenship v. Necco, LLC*, No. 2:16-cv-12082, 2018 WL 3581092, at *9 (S.D.W. Va. July 25, 2018); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 776 (D. Md. 2010)).

(ECF No. 4 at 9 n.4.)[3]   The alleged due process violation upon which Plaintiff bases her § 1985(3) claim indeed appears coextensive with her Title VII retaliation claim.   (ECF No. 1-2 at 9–17, 20–21.)   WVDHHR correctly points out that "§ 1985(3) may not be invoked to redress violations of Title VII."   *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979).   But even if the § 1985(3) claim addresses conduct beyond that actionable under Title VII, it fails for the same reason as the § 1983 claim: § 1985(3) prohibits conspiracies by "two or more *persons*" to violate another's civil rights.   42 U.S.C. § 1985(3) (emphasis supplied).   Just as the state cannot be sued under § 1983 because it is not a "person," it likewise cannot be sued under § 1985(3).   *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 854 (3d Cir. 2014) ("[S]tate agencies and their officials acting in their official capacity are not" "'persons' under §§ 1983 and 1985."); *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) (same); *Sandoval v. Dep't of Motor Vehicles*, 333 F. Supp. 2d 40, 43–44 (E.D.N.Y. 2004) ("[I]t is well settled that a State and its agencies are not 'persons' under [§] 1985."); *see New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 249 (4th Cir. 2012) (explaining *in pari materia* canon of statutory construction).   As such, the undersigned **FINDS** that WVDHHR cannot be sued under § 1985(3) and respectfully **RECOMMENDS** that its motion to dismiss (ECF No. 3) be **GRANTED** as to that claim.

### B.  *Whaley's Motion to Dismiss (ECF No. 6)*

#### 1.  *42 U.S.C. §§ 1983 and 1985(3) Claims*

Whaley first argues that to the extent Plaintiff asserts a 42 U.S.C. § 1983 claim against him in his official capacity, it fails because he is not a "person" who may be sued under that statute in his official capacity.   (ECF No. 7 at 6–7.)   Indeed, an action against

---

3  Plaintiff does not respond to this argument, either.   (ECF No. 12.)

a state official in his official capacity "represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1985)).   Therefore, the undersigned **FINDS** that Plaintiff cannot bring a § 1983 or 42 U.S.C. § 1985(3) claim against Whaley in his official capacity for the same reasons she cannot sue WVDHHR under those statutes and respectfully **RECOMMENDS** that Whaley's motion to dismiss (ECF No. 6) be **GRANTED** as to any § 1983 or § 1985(3) claims against him in his official capacity.

As to the § 1983 claim against him in his personal capacity, Whaley contends that the complaint fails to allege a due process violation because it details "several pre-determination hearings," an internal investigation, and an external investigation related to her suspension.   (ECF No. 7 at 7–8.)   To establish a procedural due process[4] cause of action, the complaint must plead facts showing that the plaintiff "had a constitutionally cognizable life, liberty, or property interest" of which a state actor deprived him through constitutionally inadequate procedures.   *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).   Whaley does not argue otherwise (ECF No. 7 at 7–8), so the undersigned assumes that Plaintiff possesses a protected property interest in her continued employment with WVDHHR.   *See Hoback v. Cox*, No. 3:19-cv-00460, 2020

---

4 "[I]t is doubtful" that Plaintiff's interest in her public employment, which is conferred by state law, is "a fundamental interest embodied in the Constitution" that is "subject to substantive due process review." *Huang v. Bd. of Governors*, 902 F.2d 1134, 1142 n.10 (4th Cir. 1990); *see Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009) ("A government employee has a protected property interest in continued public employment only if he can show a legitimate claim of entitlement to his job under state law." (internal quotation marks omitted)).   Therefore, the undersigned **FINDS** that any § 1983 substantive due process claim Plaintiff seeks to allege against Whaley necessarily fails and **RECOMMENDS** that Whaley's motion to dismiss (ECF No. 6) be **GRANTED** as to any such claim.

WL 2367011, at *4 (S.D.W. Va. May 11, 2020) (holding that nurse employed by WVDHHR had property interest in job based on statutory right to file grievance).

"At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950)). When a public employee is terminated, due process entitles him "to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)). In such cases, prior to his termination, the employee must be provided "oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Id.* (citing *Loudermill*, 470 U.S. at 546).

But where, as here, the employee is merely temporarily suspended without pay, "a sufficiently prompt postsuspension hearing" may constitute the only process due. *Id.* at 932. In other words, a temporary suspension of employment warrants fewer procedural protections than a termination of employment. *Id.* To determine the procedural safeguards merited by a given situation, this Court balances three factors: "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and "the Government's interest." *Id.* at 931–32 (quoting *Mathews*, 424 U.S. at 335).

In this case, as Whaley points out, the complaint details an April 10, 2019 "pre-determination conference" relating to the parking lot incident and a June 7, 2019 "pre-

determination conference" relating to the active shooter training incident, as well as a pre-suspension internal investigation of Plaintiff's "sex/gender bias" accusation against McKay and an August 20, 2019 Level I grievance hearing corresponding with that accusation. (ECF No. 1-2 at 9–14.) The complaint further details—and Whaley also notes—that Plaintiff accelerated her Level I grievance to Level III following her suspension and filed sex discrimination and retaliation charges with the EEOC. (*Id.* at 15.) Whaley contends that the process accorded Plaintiff before and after her suspension was more than sufficient and maintains that her claimed due process violation is simply a disagreement with the outcome. (ECF No. 7 at 8.) He is correct that "procedural due process does not require certain results—it requires only fair and adequate procedural protections." *Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002).

Notably, Plaintiff does not assert that she did not receive notice of WVDHHR's adverse action against her or a hearing at which she could respond to the accusations; rather, her due process claim is based on Defendants' alleged reliance on false evidence and refusal to identify witnesses or provide her with documentation of the evidence it used against her. (ECF No. 1-2 at 20–21.) But none of those claimed deficiencies constitutes a procedural due process violation. The truth of the stated reasons for an employee's discharge has no bearing on whether the process provided to the employee was constitutionally adequate. *Bishop v. Wood*, 426 U.S. 341, 349 (1976). And the employee has no constitutional due process right to confront witnesses. *Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1283 n.7 (4th Cir. 1995). Nor is there a constitutional requirement "that all evidence on a charge or even the documentary evidence be provided." *Linton v. Frederick Cty. Bd. of Cty. Comm'rs*, 964 F.2d 1436, 1440 (4th Cir. 1992). As such, the undersigned **FINDS** that Plaintiff's complaint fails to allege a

procedural due process violation against Whaley and **RECOMMENDS** that Whaley's motion to dismiss (ECF No. 6) be **GRANTED** as to that claim.

Relatedly, a claim brought pursuant to § 1985(3) requires the plaintiff to establish an underlying constitutional violation. *McNutt v. Duke Precision Dental & Orthodontic Labs., Inc.*, 698 F.2d 676, 680 (4th Cir. 1983) ("Section 1985(3) merely provides a remedy for the violation of rights guaranteed by federal law or the Constitution." (citing *Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1333 (4th Cir. 1976))).   In light of the undersigned's finding that Plaintiff has failed to allege a due process violation, the undersigned further **FINDS** that Plaintiff's complaint fails to state a cognizable § 1985(3) claim and **RECOMMENDS** that Whaley's motion to dismiss (ECF No. 6) be **GRANTED** as to that claim.

### 2. Defamation Claim

Whaley next argues that Plaintiff's defamation claim against him should be dismissed because his allegedly defamatory communications are subject to a qualified privilege.   (ECF No. 7 at 8–12.)   In West Virginia, "[t]he essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury."   Syl. Pt. 5, *Zsigray v. Langman*, 842 S.E.2d 716 (W. Va. 2020) (quoting Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W. Va. 1983)).   "A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter; however, a bad motive will defeat a qualified privilege

defense." *Id.* at Syl. Pt. 10 (quoting Syl. Pt. 4, *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219 (W. Va. 1994)).

Plaintiff contends that Whaley's assertion of qualified privilege fails because he did not have "a good faith belief in the truth of [his] statements." (ECF No. 13 at 8.) Indeed, "[a] qualified privilege . . . may . . . be defeated" where the plaintiff alleges "an intentional publication of false defamatory material" or "a publication of false defamatory material in reckless disregard for its truth or falsity." *Crump*, 320 S.E.2d at 78. The complaint in this case avers that Whaley drafted the August 29, 2019 suspension letter to include what he knew to be false statements that "relied on putative institutional complaints that never existed, and a derogatory EEO report that never existed" and that he "falsely claimed" to McKay and Morton that the allegedly nonexistent EEO report stated that "all of [Plaintiff's] co-workers called [her] violent, threatening, aggressive, and someone they never wanted to be around." (ECF No. 1-2 at 18.) At the very least, these allegations suggest that Whaley made the purportedly defamatory statements without regard to their truth. Therefore, the undersigned **FINDS** that Whaley cannot assert a qualified privilege to publication at this stage and **RECOMMENDS** that his motion to dismiss (ECF No. 6) be **DENIED** as to Plaintiff's defamation claim against him.

To the extent Whaley contends that his allegedly defamatory statements were not "published" because they were not communicated to a third party (*see* ECF No. 14 at 9), he raises the argument for the first time in earnest in his reply brief, so the undersigned need not address it. *See Moss v. Erie Ins. Prop. & Cas. Co.*, No. 2:19-cv-00409, 2020 WL 1228425, at *5 (S.D.W. Va. Mar. 12, 2020) ("[T]he court does not generally consider arguments made for the first time in a reply . . . ."). Regardless, "publication" in the defamation context simply means that the statement is communicated "to a third person,

18

that is, to someone other than the originator and the person defamed." *Crain v. Lightner*, 364 S.E.2d 778, 785 (W. Va. 1987). The complaint makes clear that McKay received a copy of the suspension letter and that she and Morton heard Whaley's "[o]ral[] threat[s]." (ECF No. 1-2 at 18, 31.) Even if McKay and Morton, as Plaintiff's supervisors, were "privileged" to Whaley's communications, a finding of qualified privilege is not appropriate at this point because, as the undersigned has just explained, the complaint alleges that Whaley made the statements in bad faith.

    *3. Title VII Claims*

    Lastly, Whaley argues that Plaintiff cannot bring her Title VII claims against him in his individual capacity, and to the extent she can, she has not sufficiently alleged that he harbored a discriminatory animus, and he is entitled to qualified immunity. (ECF No. 7 at 12–17.) As the undersigned has already explained when addressing Plaintiff's Title VII claims against WVDHHR, qualified immunity does not apply to Title VII claims. *Cutts*, 17 F. App'x at 136–37. Again, this is because qualified immunity shields government officials sued in their individual capacities from liability, *Ridpath*, 447 F.3d at 306, but "individuals are not subject to liability under [Title VII]," *Scott*, 673 F. App'x at 307–08. Title VII's proscriptions apply to "an employer," and supervisors sued in their individual capacities do not fall within the statutory definition of that term. *Lissau*, 159 F.3d at 181. In other words, Whaley, as Plaintiff's supervisor, is not the proper defendant for her Title VII claims. *Id.* Therefore, the undersigned **FINDS** that Plaintiff's Title VII claims against Whaley in his individual capacity[5] necessarily fail and

---

5 To the extent Plaintiff brings her Title VII claims against Whaley in his official capacity, they are simply duplicative of her Title VII claims against WVDHHR. *Adams*, 884 F.3d at 225 (quoting *Monell*, 436 U.S. at 690 n.55).

**RECOMMENDS** that his motion to dismiss (ECF No. 6) be **GRANTED** as to those claims.

    *C. McKay's Motion to Dismiss (ECF No. 9)*

        *1. Title VII Claims*

McKay first argues, like Whaley, that she cannot be sued under Title VII because she is Plaintiff's supervisor.   (ECF No. 10 at 5–7.)   Indeed, for the same reasons as with respect to Whaley, the undersigned **FINDS** that Plaintiff cannot bring her Title VII claims against McKay in her individual capacity and **RECOMMENDS** that McKay's motion to dismiss (ECF No. 9) be **GRANTED** as to those claims.

        *2. 42 U.S.C. §§ 1983 and 1985(3) Claims*

Next, McKay argues that Plaintiff's 42 U.S.C. § 1983 claims against her fail because the allegations in the complaint reflect that McKay engaged in conduct in the scope of her employment with WVDHHR, which, according to McKay, indicates that Plaintiff brings this action against her only in her official capacity.   (ECF No. 10 at 7–8.)   McKay correctly asserts that any claim against her in her official capacity is effectively a claim against WVDHHR, which cannot be sued under § 1983.   (*Id.*)   As the undersigned has already explained with regard to any such claim against Whaley in his official capacity, the undersigned **FINDS** that Plaintiff cannot bring a § 1983 or 42 U.S.C. § 1985(3) claim against McKay in her official capacity for the same reasons she cannot sue WVDHHR and respectfully **RECOMMENDS** that McKay's motion to dismiss (ECF No. 9) be **GRANTED** as to any § 1983 or § 1985(3) claims against her in her official capacity.

But contrary to McKay's suggestion, the distinction between official capacity claims and individual or personal capacity claims "is 'best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts

the alleged injury.'" *Adams*, 884 F.3d at 225 (quoting *Hafer v. Melo*, 502 U.S. 21, 26 (1991)).   When the allegations in the complaint reflect that the plaintiff seeks relief from the defendant personally, the action is best characterized as an individual-capacity suit. *See id.* at 225–26.   That is true here: the complaint explicitly states that McKay is sued in her "personal capacity," and there is no indication that Plaintiff seeks damages only from the State of West Virginia, rather than McKay.   (ECF No. 1-2 at 3, 25.)   As McKay herself points out, at least one category of damages Plaintiff requests is not recoverable against McKay in her official capacity.   (ECF No. 10 at 13.)   This implies that Plaintiff brings her claims against McKay in her individual capacity.   *See Alden v. Maine*, 527 U.S. 706, 757 (1999) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.").

McKay argues that she is entitled to qualified immunity with respect to Plaintiff's § 1983 claim against her in her individual capacity.   (ECF No. 10 at 8–10.)   More specifically, like Whaley, McKay contends that Plaintiff received adequate process relating to her suspension and her grievance against McKay.   (*Id.* at 10.)   For the reasons the undersigned explained when addressing Plaintiff's § 1983 and § 1985(3) claims against Whaley, the undersigned **FINDS** that the complaint's allegations do not establish a procedural due process [6] violation and **RECOMMENDS** that McKay's motion to dismiss (ECF No. 9) be **GRANTED** as to Plaintiff's § 1983 and § 1985(3) claims against her.

---

6 The undersigned further **FINDS** that to the extent Plaintiff seeks to allege a substantive due process claim against McKay, it fails for the same reasons as it fails against Whaley, and **RECOMMENDS** that McKay's motion to dismiss (ECF No. 9) be **GRANTED** as to any such claim.   *See supra* n.4.

### 3. *Defamation Claim*

Finally, McKay asserts that a qualified privilege precludes Plaintiff's defamation claims against her and that she did not make the allegedly defamatory statements to a third party without "a reasonable right to know." (ECF No. 10 at 11–13.) Although McKay distinguishes these concepts, they are actually the same: the qualified privilege derives from the "legitimate interest in the subject matter" possessed by the third party to whom the statement is made. Syl. Pt. 10, *Zsigray*, 842 S.E.2d 716 (quoting Syl. Pt. 4, *Dzinglski*, 445 S.E.2d 219). And as the undersigned has already explained when addressing this same argument as it relates to Whaley, "a bad motive will defeat a qualified privilege defense." *Id.* (quoting Syl. Pt. 4, *Dzinglski*, 445 S.E.2d 219). The complaint alleges that McKay "fabricated . . . false allegations" about Plaintiff "engag[ing] in violent or aggressive conduct" and included them in two "pre-determination" letters, "smear[ed] [Plaintiff] with a Hollywood-esque tale" at her Level I grievance hearing about Plaintiff's conduct despite knowing "there was no basis to believe any such conduct occurred," and "[c]ollaborat[ed]" with Whaley on the suspension letter. (ECF No. 1-2 at 18.) At this stage, these allegations are adequate to suggest that McKay made the allegedly defamatory statements in bad faith. Therefore, the undersigned **FINDS** that Plaintiff's complaint states a plausible defamation claim against McKay and **RECOMMENDS** that her motion to dismiss (ECF No. 9) be **DENIED** as to that claim.

### IV.   RECOMMENDATION

For the reasons stated herein, the undersigned respectfully **RECOMMENDS** that Defendants' motions to dismiss (ECF Nos. 3, 6, 9) be **GRANTED IN PART** and **DENIED IN PART**.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge.    Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.    Extension of this time period may be granted by the presiding District Judge for good cause shown.    Copies of any objections shall be provided to the opposing party or, if it is represented by counsel, to its counsel, and to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.    28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff and to transmit a copy to counsel of record.

ENTER:      August 17, 2020

Dwane L. Tinsley
United States Magistrate Judge