IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LISA MARIE KERR,

                  Plaintiff,

v.                                                    CIVIL ACTION NO.  2:20-cv-00190

SHANNON McKAY, et al.,

                  Defendants.

## PROPOSED FINDINGS & RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 2.)  Before this Court are the motions for summary judgment filed by Defendants West Virginia Department of Health and Human Resources ("WVDHHR") (ECF No. 78), Lance Whaley ("Whaley") (ECF No. 82), and Shannon McKay ("McKay") (ECF No. 74) (collectively, "Defendants").  For the reasons explained more fully herein, the undersigned respectfully **RECOMMENDS** that Defendants' motions (ECF Nos. 74, 82, and 78) be **GRANTED**.

## I.    BACKGROUND

Plaintiff Lisa Marie Kerr ("Plaintiff") brings this civil action for defamation and unlawful discrimination arising from her suspension without pay from her employment as a Social Services Worker II in the Adult Services department of the West Virginia

Department of Health and Human Resources ("WVDHHR") between September 5, 2019, and September 18, 2019. (*See* ECF Nos. 30 and 74-1 at 2.) Plaintiff alleges that the WVDHHR and Defendants McKay—"the Community Service Manager" of Plaintiff's Lincoln County office—and Whaley—McKay's "superior, . . . the Regional Supervisor for [WVDHHR] in District II," initiated suspension proceedings based upon "false violence accusations" as "a pretext to discriminate against LGBT employee Ms. Kerr," due to her status as a "non-gender-conforming lesbian" and her perceived failure to "speak, walk, talk and act more femininely." (ECF Nos. 30 at 2 and 94 at 22-23.) Plaintiff's central theory is that Defendants' allegedly false explanation for the suspension belies their belief of the "stereotype that lesbians are aggressive and violent." (ECF No. 94 at 22-23.)

Plaintiff avers that on March 26, 2019, she requested that a supervisor deal with two co-workers whom Plaintiff "caught sneaking off" with a state vehicle that Plaintiff "had signed out to transport a client." (ECF No. 30 at 7.) She alleges that another co-worker paged McKay, and when McKay arrived, she "immediately—and incorrectly—assumed that [Plaintiff] was the wrongdoer, rather than the victim, because of her bias against [Plaintiff] as a lesbian who does not conform to traditional feminine gender norms." (ECF No. 1-2 at 9–10.)[1] According to Plaintiff, when she tried to explain the situation to McKay, McKay shouted at her and told her that she was "being 'aggressive.'" (*Id.* at 10.) Plaintiff alleges that when she asked McKay how to report her co-workers who had used the vehicle Plaintiff had signed out, McKay demonstrated "a statement made with every type of exaggerated feminine gesture and wording one might imagine." (*Id.*) Plaintiff avers that she then accused McKay of being biased against her because she was

---

[1] With the exception of Plaintiff's claimed damages against WVDHHR, Plaintiff's Amended Complaint is identical to the allegations in her original Complaint. (*Compare* ECF No. 1-2, *with* ECF No. 30.)

"not as feminine as the other workers," and McKay "punished" her by forcing her to go home and use a day of annual leave. (*Id*. at 10–11.)

That same day, Plaintiff alleges, she filed a Level I grievance against McKay arising from the incident, in which she claimed unlawful sex discrimination and retaliation. (*Id*.) Plaintiff avers that on April 3, 2019, WVDHHR's "internal EEO investigator," Carlotta Gee ("Gee"), contacted Plaintiff, McKay, and other employees to schedule interviews for an internal "EEO investigation." (*Id*. at 11, 13.) According to Plaintiff, she also received a "pre-determination" letter from McKay that day, which "accused [Plaintiff] of wrongdoing in the same incident on which [her] Title VII grievance was based, and asked her to attend a conference." (*Id*. at 11.) Plaintiff alleges that at the April 10, 2019 conference, McKay and Whaley "falsely accused [her] of being thrown out of CAMC Hospital" and the Lincoln County Courthouse. (*Id*. at 11–12.) Plaintiff further alleges that when she asked McKay and Whaley "for the source and details of the accusations," McKay refused to tell her. She avers that her direct supervisor, Julia Morton ("Morton"), was present "and seemed flustered by the attacks on [Plaintiff]." According to Plaintiff, Morton encouraged her to "just admit it and we can get this over with." (*Id*. at 12.) Plaintiff alleges that "Whaley then leaned forward and spoke in a lowered tone: 'I don't have that EEO report, so I don't know what it says, Lisa. But let's say DHHR puts out a report that says you go around committing violence and threats everywhere you go. Wouldn't that mean we're right about this violence stuff? Wouldn't you have to admit there's something to it?" (*Id*.) Plaintiff avers that she "denied all of the accusations." (*Id*.)

Plaintiff alleges that more than a month later, on May 31, 2019, McKay "stormed into [Plaintiff's] office with another supervisor (Jennifer Beckett [("Beckett")]) in tow" after Plaintiff "(unavoidably) arrived late at an 'active shooter training[]' [conducted by

the West Virginia State Police ("WVSP")], asked a few questions, and excused herself."
(*Id.*)  According to Plaintiff, McKay appeared "[v]isibly confrontational" and "claimed
(while Beckett stood silent) that '[WVSP] are never sending anyone to DHHR again, in
the whole state, because of you screaming and threatening and bullying that police officer
in there.'"  (*Id.*)  Plaintiff avers that she "had no idea what McKay was talking about," so
she "quietly told McKay that she had no choice but to report this to the grievance board
as an additional incident of retaliation."  (*Id.*)  She alleges that McKay then accused
Plaintiff of threatening her.  (*Id.*)  According to Plaintiff, "McKay did not attend the
training, and thus could not have witnessed what she claimed to describe," and Beckett,
who did attend the training, "did not support McKay's wild accusations."  (*Id.*)  Plaintiff
alleges that McKay issued another "pre-determination" letter stemming from the active
shooter training.  (*Id.*)

Plaintiff avers that on June 6, 2019, Gee wrote a letter stating that WVDHHR
determined after its internal investigation that "a complaint" of sexual orientation
discrimination was not substantiated, but the letter "did not mention [Plaintiff's] actual
complaint for sex/gender bias and retaliation," nor did it "call [Plaintiff] an 'aggressor'"
or "describe any conduct by [her]."  (*Id.* at 13.)  However, Plaintiff alleges, the letter
included a statement of WVDHHR's zero-tolerance retaliation policy.  (*Id.*)

She further alleges that the next day, on June 7, 2019, she attended a conference
related to the active shooter training incident, at which McKay and Whaley informed her
that WVSP "filed an official complaint" against her "but refused to provide the complaint
itself, or any details."  (*Id.* at 12.)  She claims that "the second meeting went like the first:
Whaley threatened that an EEO investigation would find [Plaintiff] to be 'violent,' McKay
became irate when asked for details about anything, and [Plaintiff's] inexperienced

supervisor Morton offered no corroboration, but begged [Plaintiff] to admit everything so that they could leave." (*Id*. at 12–13.) Plaintiff avers that she offered to apologize to the officer for arriving at the training late and leaving early, but McKay "became furious, panicked and defensive" and "shouted" at Plaintiff to not contact WVSP or "question anything I say ever again." (*Id*. at 13.) According to Plaintiff, "McKay then called in Beckett" and "tried to coach [her] into saying that [Plaintiff] 'waved her fists in the officer's face' and threatened violence" at the training, but Beckett confirmed Plaintiff's statements about what happened. (*Id*.) Plaintiff claims that she asked McKay "to stop with this fist thing now" and made a "pleading" gesture with her hands, but "McKay joyously cried out" that Plaintiff was "putting her fists up in a boxing stance." (*Id*.) Plaintiff avers that Beckett "roll[ed] her eyes" and left the room. (*Id*.)

According to Plaintiff, "McKay finally made herself available for a Level I grievance hearing" on August 20, 2019. (*Id*.) Plaintiff alleges that McKay "invented a tale of [Plaintiff] rampaging through the DHHR parking lot, chasing women around cars, and brandishing her fists 'like a boxer,'" and "claim[ed] that everyone at DHHR was so frightened of [Plaintiff] that they asked McKay to call 911 and change the locks so that [Plaintiff] could not re-enter the building." (*Id*. at 13–14.) Plaintiff further alleges that McKay admitted upon cross-examination that she did not witness the incident in the parking lot but "claimed that her story was supported by four witnesses." (*Id*.) According to Plaintiff, McKay "could only produce two" witnesses, and neither witness's testimony supported McKay's version of events. (*Id*. at 14.) Plaintiff avers that one witness "testified that the idea to call 911 and change locks came from McKay, not from anyone else," but the witness did not follow McKay's directions "because she did not see any reason for it." (*Id*.) Plaintiff alleges that she then became "terrified that McKay would call 911 on her,

falsely claim she was rampaging like a boxer, and get her shot dead," which caused her to have a panic attack at work the following day and use prescription anti-anxiety medication "for nearly a week." (*Id.*) She claims that she "still has tremors whenever she sees McKay, and leaves the room when possible," that she "is afraid to speak when McKay is in the vicinity," and that she "stuffs her hands in her pockets so that McKay will not make the delusional claim that [she] is using 'boxing' moves or 'fist' gestures." (*Id.*)

On August 28, 2019, Plaintiff had a performance review with Morton, and Morton rated her performance as "meets expectations" or "exceeds expectations" in every area except one: Morton rated Plaintiff's performance as "needs improvement" in the area of "Works well with others to achieve organization's goals." (*Id.* at 32–37.) McKay reviewed and initialed the review before it was presented to Plaintiff. (*Id.* at 37.) Plaintiff wrote a response to the review in which she stated that she "strongly disagrees that she has problems dealing with outside agencies" and attributed her "problem" to McKay, whom she stated "is a liar" and "is biased against LGBT people." (*Id.* at 38.)

Plaintiff alleges that the following day, "McKay and Whaley called [Plaintiff] into McKay's office" and presented her with a letter notifying her that she would be suspended without pay for two weeks. (*Id.* at 14; *see id.* at 27–31.) She avers that Whaley told her that the suspension was based on a report from the internal EEO investigation, which included statements from interviews with Plaintiff's co-workers that she was "violent and aggressive and threatening and they can't stand to be around [her]." (*Id.* at 14–15.) Plaintiff claims that when she asked to see the report, Whaley refused to provide it because it was "confidential" and "taunted" her that "it's bad." (*Id.* at 15.) The letter explained that Plaintiff was being suspended because of the parking lot and active shooter training incidents and "corrective action" in the form of a November 5, 2018 "EPA3"

document and conversations that occurred on February 22, 2019, and April 19, 2019. (*Id.* at 28–29.) It was signed by Whaley, and a copy was provided to McKay and to the "WV Division of Personnel" and placed in an administrative file and in Plaintiff's personnel file. (*Id.* at 31.) Plaintiff avers that "[n]one of the conduct for which [she] was suspended ever occurred." (*Id.* at 15.)

The following day, Plaintiff alleges, she "upgraded her grievance to Level III based on the two-week suspension without pay" and filed a charge with the federal Equal Employment Opportunity Commission ("EEOC") against WVDHHR, Whaley, and McKay that alleged sex discrimination and retaliation. (*Id.*) Plaintiff claims that WVDHHR "refused to produce evidence in the grievance process" until an administrative law judge directed it to do so, and when Plaintiff reviewed the evidence that was produced, "*zero* allegations in the Suspension Letter were supported." (*Id.* at 16 (emphasis in original).) She alleges that the letter "was and is a fabric of lies" that Whaley and McKay "created to retaliate against [her] for pursuing a sex/gender bias complaint." (*Id.*)

Following the Court's ruling on Defendants' initial threshold motions, surviving are Plaintiff's claims for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, against Defendant WVDHHR, as well as defamation claims under West Virginia law against WVDHHR, Defendant Lance Whaley ("Whaley"), Regional Director for District II of the WVDHHR, and Shannon McKay ("McKay"), Community Service Manager of WVDHHR's Lincoln County office (collectively, "Defendants"). (*See* ECF No. 31.)

WVDHHR filed its motion for summary judgment on June 23, 2021, arguing that summary judgment should be granted on both Plaintiff's Title VII claim as well as her defamation claim against WVDHHR. (ECF No. 78.) Plaintiff timely responded (ECF No.

94), and WVDHHR timely replied (ECF No. 112). Whaley also filed his motion for summary judgment on June 23, 2021, arguing that summary judgment should be granted on Plaintiff's remaining defamation claim against Whaley. (ECF No. 82.) Plaintiff timely responded (ECF No. 97), and Whaley timely replied (ECF No. 113). Finally, McKay filed her motion for summary judgment on June 21, 2021, likewise arguing that summary judgment should be granted on Plaintiff's remaining defamation claim against McKay. (ECF No. 74.) Plaintiff timely responded (ECF No. 95), and McKay timely replied (ECF No. 110). As such, the motions for summary judgment are fully briefed and ripe for resolution.

## II.   **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. In pertinent part, this rule directs that summary judgment "shall" be granted when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

When opposing a properly-supported motion for summary judgment, "[t]he burden is on the non-moving party to show that there is a genuine issue of material fact for trial[.]" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Summary judgment is appropriate when the non-moving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The non-moving party cannot meet its burden to show a genuine issue of material fact when she sets forth nothing more than the "mere existence of a scintilla of evidence[.]" *Liberty Lobby*, 477 U.S. at 252. Likewise, the non-moving party may not "rest[] upon mere allegations or denials of his pleadings," and "conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion." *Safeco Ins. Co. of Am. v. Mountaineer Grading Co.*, 2:10-cv-01301, 2012 WL 830158, at *3 (S.D. W. Va. Mar. 9, 2012); *Liberty Lobby*, 477 U.S. at 256; *Guessous*, 828 F.3d at 216.

Rather, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Liberty Lobby*, 477 U.S. at 256. To meet this burden, the non-moving party "must set forth specific facts" by offering "sufficient proof in the form of admissible evidence[.]" *Liberty Lobby*, 477 U.S. at 256; *Guessous*, 828 F.3d at 216. Such evidence may include "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). To that end, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the non-moving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)). Likewise, when facts established by a motion for summary judgment are left uncontroverted by the non-moving party, the Court must nonetheless examine the merits of the moving party's arguments "and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Lovejoy v. Saldanha*, 838 F. Supp. 1120, 1121 n.1 (S.D. W. Va. 1993); *Bridgestone Americas Tire Operations, LLC v. Pristine Clean Energy, LLC*, No. 1:21-cv-14, 2021 WL 4822489, at *2 (N.D.W. Va. Oct. 15, 2021).

Finally, while it is unclear whether a filing made by an attorney representing herself must receive the same liberal construction as a filing made by a non-attorney pro se plaintiff, the undersigned affords Plaintiff—a licensed West Virginia attorney representing herself—this benefit "out of an abundance of caution." *Kerr v. Bailey*, 3:19-CV-0443, 2019 WL 6598355, at *3 (S.D. W. Va. Dec. 4, 2019), *aff'd*, 828 F. App'x 908 (4th Cir. 2020).

## III.   <u>ANALYSIS</u>

### A.   <u>Plaintiff's Title VII Retaliation Claim Against WVDHHR</u>

In order to establish a *prima facie* claim for Title VII retaliation, Plaintiff must demonstrate (1) that she engaged in a protected activity; (2) that her employer took an

adverse employment action against her, and (3) that there was a causal link between the two events. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015). Such retaliation claims are analyzed using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973). Under this framework, if Plaintiff meets her burden to produce evidence of a *prima facie* case of retaliation, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* Once the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to Plaintiff to demonstrate "that the employer's proffered explanation is merely a pretext for discrimination." *Id.* at 804.

A Title VII retaliation claim is not a judicial review of an employer's personnel decisions. *Adkins v. CSX Transp., Inc.*, 3:18-CV-0321, 2021 WL 3731828, at *3 (S.D. W. Va. Aug. 23, 2021). As the Fourth Circuit explained, "[b]ecause Title VII prohibits discrimination only when it results from particular, enumerated motivations, when an employer articulates a reason for discharging the plaintiff that the statute does not proscribe, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason" for the adverse employment action. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quotation marks omitted). It is not the Court's role "to sit as a kind of super-personnel department weighing the prudence of employment decisions." *Villa v. CavaMezze Grill*, 858 F.3d 896, 900-901 (4th Cir. 2017). Rather, "a plaintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 238, 239 (4th Cir. 1991) (applying *McDonnell Douglas*). "The plaintiff may not satisfy his [or her] burden

by merely stating that the defendants' stated reason is pretext and vaguely hinting that sufficient evidence exists to refute the defendants' stated reason." *Powers v. Covestro LLC*, 2:16-CV-05253, 2017 WL 1952230, at *6 (S.D. W. Va. May 10, 2017).

Assuming, without deciding, that Plaintiff carried her initial burden of producing evidence of a *prima facie* case, WVDHHR has in turn met its burden to articulate a legitimate, non-discriminatory reason for the adverse employment action under the *McDonnell Douglas* framework. As the Administrative Law Judge determined after hearing extensive witness testimony during the administrative proceedings, WVDHHR "had legitimate non-discriminatory reasons for suspending [Plaintiff] based upon violations of specific policy provisions," including DHHR Policy 2108-Employee Conduct which requires employees to "conduct themselves professionally in the presence of residents/patients/clients, fellow employees and the public . . . and be ethical, alert, polite, sober, and attentive[.]" (ECF No. 78-1 at 22) (citing MAST000365-66.)

This determination is supported by substantial evidence from the record. Despite consistent coaching and warning from WVDHHR supervisors, Plaintiff repeatedly reacted to perceived wrongs—some of which may have been valid—with disruptive and unprofessional conduct. It is undisputed that, on belief that two coworkers jumped in line to use an agency vehicle she had reserved, Plaintiff confronted them in the parking lot and spoke in a raised voice, and that supervisors intervened. (ECF No. 102 at Disc 1, Time Stamp 8:32.) It is also undisputed that during active shooter training conducted by a representative of the West Virginia State Police, Plaintiff arrived late, interrupted the representative, challenged the accuracy of his statement in front of the entire room, and then left early. (*Id.* at Disc 3, Time Stamp 31:06; Disc 2, Time Stamp 34:00, 4:36:00, and 5:16:00.) Multiple coworkers testified that Plaintiff frequently yelled or screamed at

others. (*Id.* at Disc 2, Time Stamp 12:26, 2:30:00, 4:05:00, 5:39:00; Disc 3, Time Stamp 8:32, 28:24.) Plaintiff's direct supervisor, Julia Morton, also testified that Plaintiff sharply criticized the quality of Morton's own handling of cases. (*Id.* at Disc 2, Time Stamp 2:45:00.) Multiple employees and supervisors testified that Plaintiff's behavior made them feel intimidated or concerned for their own safety. (*Id.* at Disc Two, Time Stamp 12:26, 4:47:00, and 5:39:00; Disc 3, Time Stamp 3:30:28.) Plaintiff herself conceded that she "lost her temper and shouted at coworkers" and may have been impolite. (ECF No. 94 at 15.) Accordingly, based upon the facts set forth in the record, WVDHHR has met its burden to articulate a legitimate, non-discriminatory reason for the adverse employment.

Finally, the undersigned turns to Plaintiff's burden of showing that WVDHHR's articulated reason for her discipline set forth in the August 29, 2019 Notice of Disciplinary Suspension (the "Suspension Notice") was mere pretext. *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). Plaintiff's response essentially criticizes the conclusions drawn from WVDHHR's investigation based upon Plaintiff's characterization of select testimony from the administrative proceedings. However, Plaintiff's challenge to the perceived adequacy of WVDHHR's investigation is simply irrelevant—WVDHHR's personnel decisions in this context are not at issue. *Villa*, 858 F.3d at 900-901; *Adkins*, 2021 WL 3731828, at *3 ("Plaintiffs must do more than submit the 'unexceptional fact' that they disagree with [the defendant's] final determinations.") (citation omitted).

The only evidence Plaintiff can produce in support of her assertion of pretext is Defendants' use of the word "aggressive" to describe her conduct. Plaintiff offered no evidence that the discipline levied by WVDHHR was a pretext for her failure to conform to any gender roles. While she makes several conclusory statements in her supporting affidavit, "summary judgment affidavits cannot be conclusory or based upon hearsay."

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Plaintiff conceded that she "lost her temper and shouted at coworkers" and may have been impolite. (ECF No. 94 at 15.) As the ALJ noted, such conduct is unprofessional and disruptive regardless of one's perceived gender identity. (ECF No. 78-1 at 28.) Because Plaintiff failed to demonstrate "concrete evidence from which a reasonable juror could" find that WVDHHR suspended Plaintiff "for any purpose other than [its] stated legitimate reason," Plaintiff is "unable to carry [her] burden" to show she was suspended for pretextual reasons. Accordingly, summary judgment must be granted. *Liberty Lobby*, 477 U.S. at 256; *Adkins*, 2021 WL 3731828, at *4.

### B.    Plaintiff's Title VII Discrimination Claim Against WVDHHR

Along with her retaliation claim, Plaintiff brought a discrimination claim on the basis of her sex/gender under Title VII. (ECF No. 30 at 20.) Specifically, Plaintiff alleged that she was suspended for two weeks and lost two job promotions because WVDHHR supervisors McKay and Whaley "believe . . . [the] improper gender stereotype[] that lesbians who fail to walk, talk or dress femininely are inherently violent and aggressive . . . so deeply that they make wild accusations against Kerr, and punish her for violence and aggression which they know did not occur." (ECF No. 30 at 20-22.)

In order to establish a *prima facie* case for Title VII discrimination with direct evidence, Plaintiff must demonstrate that WVDHHR "used a forbidden consideration" in reaching its adverse employment decisions. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003). To establish a *prima facie* case with indirect evidence, Plaintiff must demonstrate "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190

14

(4th Cir. 2010). Just as with Plaintiff's retaliation claim, her Title VII discrimination claim is analyzed using the *McDonnell Douglas* burden-shifting framework. 411 U.S. 792. Under this framework, if Plaintiff meets her burden to produce evidence of a *prima facie* case of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* Once the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to Plaintiff to demonstrate "that the employer's proffered explanation is merely a pretext for discrimination." *Id.* at 804.

Assuming, without deciding, that Plaintiff carried her initial burden of producing evidence of a *prima facie* case, WVDHHR has in turn met its burden to articulate a legitimate, non-discriminatory reason for the adverse employment action under the *McDonnell Douglas* framework as addressed in Section III.A., *supra*. Turning to Plaintiff's burden of showing that WVDHHR's articulated reason for her discipline was mere pretext, Plaintiff's response largely relied on her characterizations and opinions of carefully-highlighted excerpts of testimony presented during the administrative proceeding to argue that her behavior was not in fact "aggressive" as alleged in her Suspension Notice. Plaintiff's opinions regarding the testimony given during the administrative proceedings are largely misleading or unsupported.

For instance, Plaintiff asserted in her response that McKay's "story of Ms. Kerr hopping around like a boxer dissolved in cross-examination." (ECF No. 94 at 22.) While the record shows that no witness literally used the phrase "Ms. Kerr hopping around like a boxer," Plaintiff's opinion of McKay's testimony on cross-examination is not supported by the audio record. (*See* ECF No. 102.) Additionally, witness Jana Rooney, who testified she was also present for this incident, described Plaintiff's physical stance and movements

in a boxing-like manner, and testified that she thought Plaintiff was going to hit either herself or McKay. (ECF No. 102 at Disc 3, Time Stamp 16:00.)

Moreover, Plaintiff's disagreement on whether or not her conduct was "aggressive" falls short of establishing pretext for two reasons. First, Plaintiff's "own opinions and conclusory allegations do not have sufficient probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). *See also Evans v. Techs. Application & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("While a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient").

Further, even if Plaintiff had produced evidence that WVDHHR, through its agents Whaley and McKay, were factually wrong in believing that she behaved aggressively, an employer's good-faith belief in the validity of a given reason precludes a finding of pretext. *Adkins v. CSX Transp., Inc.*, 3:18-CV-0321, 2021 WL 3731828, at *4 (S.D. W. Va. Aug. 23, 2021); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). In other words, Plaintiff cannot establish pretext merely by showing the asserted legitimate, nondiscriminatory reason for discipline was ultimately not based on accurate facts; rather, she must show that the reason for her discipline was discriminatory. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (quoting *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Simply put, "evidence of personality conflicts in the workplace, while regrettable, does not constitute proof of a Title VII violation." *Robbins v. Jefferson Cty. School Dist. R-1*, 186 F.3d 1253, 1260 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). *See also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1406 (10th Cir. 1997).

Plaintiff further argued that suspension letters produced by WVDHHR "establish that no DHHR Region II employee (except LGBT employee Ms. Kerr) has ever been punished with suspension for a verbal argument in the office." (ECF No. 94 at 23.) However, Defendants never claimed that Plaintiff's suspension was based upon a single "verbal argument." There is substantial evidence in the record that Plaintiff had been progressively "counseled, advised, and warned that she had to use more tact and avoid losing her temper with supervisors, co-workers, and outside contacts[, and] [d]espite those warnings [Plaintiff] had two major disruptive incidents of losing her temper and disrupting normal operations of the department." (ECF No. 78-1 at 28.) In sum, Plaintiff failed to demonstrate "concrete evidence from which a reasonable juror could" find that WVDHHR took any adverse employment action "for any purpose other than [its] stated legitimate reason." *Adkins*, 2021 WL 3731828, at *4. Accordingly, Plaintiff is "unable to carry [her] burden" to show she was suspended for pretextual reasons, and summary judgment must be granted. *Liberty Lobby*, 477 U.S. at 256;

### C. Plaintiff's Defamation Claims Against Defendants

Defamation is a "false written or oral statement that damages another's reputation." *Pritt v. Republican Nat'l Comm.*, 557 S.E.2d 853, 861 n.12 (W. Va. 2001). In West Virginia, "[t]he essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 5, *Zsigray v. Langman*, 842 S.E.2d 716 (W. Va. 2020) (quoting Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W. Va. 1983)).

As Judge Chambers noted in Plaintiff's prior defamation action against the

Marshall University Board of Governors, a nonprivileged communication is one made "to a third party" with no "legitimate interest" in the communication such that they "did not have a reasonable right to know" the contents thereof. *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74-76 (4th Cir. 2016) (citing *Bine v. Owens*, 542 S.E.2d 842, 846 (W. Va. 2000)). However, "a bad motive will defeat a qualified privilege defense." *Id.* at 76.

### i. **Plaintiff's Defamation Claim Against WVDHHR**

In support of its summary-judgment motion, WVDHHR argued that Plaintiff failed to meet two essential elements of her defamation claim: that any statements made by WVDHHR were false, and that WVDHHR made any nonprivileged communication to a third party. (ECF No. 94.) In response, Plaintiff pointed to the WVDHHR's August 29, 2019 Notice of Disciplinary Suspension (the "Suspension Notice"). (ECF No. 94 at 14) (citing MAST000364. Plaintiff asserted that the letter (1) "falsely describe[ed] Ms. Kerr as an 'aggressor' in the office vehicle dispute that led to her initial Title VII grievance, (2) falsely stat[ed] that St. Mary's Hospital, CAMC Women's and Children's Hospital, the West Hamlin Police Department, and the Lincoln County Courthouse 'requested not to work with' her, [and] (3) falsely stat[ed] that the West Virginia State Police had filed an 'official complaint' against her." (*Id.*) Plaintiff argued that these statements were provably false, and also supported a finding of bad faith that defeated WVDHHR's qualified privilege defense. (*Id.*)

Plaintiff's evidence does not support her allegation that the summaries of three statements from the Suspension Notice were false. Plaintiff's characterizations of these statements are misleading and unsubstantiated. As WVDHHR noted, (*see* ECF No. 79 at 23), a truth defense does not require a defendant to establish the literal truth of the

allegedly defamatory statement; rather, the standard is substantial truth—"minor inaccuracies" of terminology or detail do not prevent the story from being substantially true as long as the "gist" or "sting" of the defamation is true. *Ballengee v. CBS Broad., Inc.*, 331 F. Supp. 3d 533, 546 (S.D. W. Va. 2018), *aff'd*, 968 F.3d 344 (4th Cir. 2020).

The first statement Ms. Kerr pointed to stated that "[o]n March 26, 2019 there was a dispute over a rental car where you were confrontational and threatening, to the point that staff were fearful you may become physically violent toward them. An EEO investigation was completed and the investigation found that you were the aggressor, not Ms. McKay." (ECF No. 94 at 14) (citing MAST 000364.) The record shows that administrative proceedings initiated by the EEO investigation ultimately concluded that WVDHHR "was able to show that [Plaintiff] was excessively loud and disruptive during the rental car incident and refused to calm down and follow directives." (ECF No. 78-1 at 27.) While WVDHHR did not show enough evidence "to meet the pervasive requirement of proof for a hostile work environment case," the Administrative Law Judge concluded that "employees express that they were afraid of [Plaintiff] . . . based upon one or two occasions when [Plaintiff] lost her temper and shouted at coworkers." (*Id.* at 23.) The sworn testimony given by several witnesses in the course of the administrative proceedings supports this finding. (*See, e.g.*, ECF No. 102 at Disc 3, Time Stamp 8:32:00.) This includes the testimony of supervisor Jana Rooney, who described Plaintiff shaking her finger in McKay's face, yelling, and positioning her body in a posture that caused Rooney to fear that Plaintiff was going to physically strike either her or McKay. (*Id.* at 16:00:00.) Rooney testified that in her 19 years of experience as a licensed social worker, she had never felt as unsafe in the workplace as she did during this incident. (*Id.* at Time Stamp 27:26:00.) That Plaintiff disputes the conclusions drawn by Rooney and McKay

based on Plaintiff's undisputed physical posture, (*see* ECF No. 94 at 15), is irrelevant to the truth of whether the staff was fearful of physical violence.

The second statement in the Suspension Notice Plaintiff cited stated that "complaints from hospitals (St. Mary's and CAMC Women and Children's), a complaint from the Lincoln County Courthouse, and a complaint from the West Hamlin Police Department . . . [a]ll had the common complaint that you were rude and aggressive, and they have requested not to work with you." (ECF No. 94 at 15) (citing MAST000364.) Plaintiff argued that this statement is an "outright lie." (ECF No. 94 at 15.) The record is replete with evidence that the WVDHHR received complaints from individuals employed by these agencies, and that the individual complainants from these agencies requested not to work with her. (*See, e.g.*, ECF No. 102 at Disc 3, Time Stamp 25:02:00 and 2:34:40.) Again, Plaintiff's challenge is not based upon competing evidence that raises a genuine dispute as to the truth of this statement; Plaintiff does not dispute that these individuals complained or that they requested not to work with her. Instead, she again relied on an overly-literal characterization of the statement at issue to mean that "entire agencies 'requested not to work with' Ms. Kerr."[2] (ECF No. 94 at 15.) While this statement contains some ambiguity and could be written more precisely, this is insufficient to establish that the statement in the Suspension Notice was not substantially true. *Ballengee v. CBS Broad., Inc.*, 331 F. Supp. 3d at 546. Likewise, Plaintiff's speculation that if WVDHHR or its representatives had affirmatively contacted the agencies to

---

[2] Similarly, Plaintiff characterizes Defendant Whaley's sworn testimony given during the administrative proceedings as an admission "that the Suspension Letter's assertion that multiple agencies 'requested not to work with' Ms. Kerr was 'inaccurate.'" (ECF No. 97 at 10.) Plaintiff mischaracterized Whaley's testimony; it was Plaintiff who described Whaley's statement as "inaccurate." (*See* ECF No. 102 at Disc 3, Time Stamp 3:34:00.) Whaley testified that it would be "more accurate" to describe the complaints from outside agencies as complaints by an individual from the agency. (*See id.*)

confirm the complaints that the complaints would not have been substantiated falls short of "concrete evidence from which a reasonable juror could return a verdict in [Plaintiff's] favor." *Liberty Lobby*, 477 U.S. at 256.

Finally, Plaintiff pointed to the statement in the Suspension Notice that "[a]n official complaint was filed by the trainer who was administering the Active Shooter Training due to your rude and disruptive behaviors on May 29, 2019" as "falsely stating that the West Virginia State Police had filed an 'official complaint' against her." (ECF No. 94 at 19. Similar to the second statement discussed above, Plaintiff does not dispute that the officer who conducted the training was employed by the West Virginia State Police or that the officer complained to WVDHHR that Plaintiff engaged in "rude and disruptive behaviors on May 29, 2019." (*See id.*) The record supports this statement. (*See, e.g.*, ECF No. 102 at Disc 1, Time Stamp 5:16:00.) Rather, Plaintiff relied on an overly-literal characterization of the statement at issue to mean that the entire State Police as an agency filed an "official" complaint. (*See id.*) This is insufficient to establish that the statement in the Suspension Notice was not substantially true. *Ballengee v. CBS Broad., Inc.*, 331 F. Supp. 3d at 546. In sum, Plaintiff has failed to come forward with "concrete evidence from which a reasonable juror could" find these three statements in the Suspension Notice to be false. *Liberty Lobby*, 477 U.S. at 256. Accordingly, she has failed to raise a genuine dispute of material fact on an essential element of her defamation claim.

Further, Plaintiff failed to raise a genuine dispute of material fact on the privilege element of her defamation claim. As Plaintiff correctly argued in her response, (*see* ECF No. 94 at 18-19), "a bad motive will defeat a qualified privilege defense." *Kerr*, 824 F.3d at 76. Plaintiff relied on the same overly-literal characterizations of falsity as evidence of WVDHHR's bad motive. For the same reasons stated *supra*, therefore, her argument fails.

21

There is no evidence that WVDHHR acted in bad faith by publishing false statements—to the contrary, each of the statements identified by Plaintiff is supported by undisputed testimony in the record. Plaintiff's challenge to the characterization of undisputed facts is unavailing. Further, it is clear that WVDHHR had a legitimate interest in the subject matter of the statements, as Plaintiff's employer. Finally, WVDHHR published the letter only to parties with a legitimate interest in the subject matter. The West Virginia Division of Personnel ("WVDOP") had an unquestionably legitimate interest in receiving the Suspension Notice as provided by West Virginia law. W. Va. C.S.R. § 143-1-12.a (requiring WVDHHR to transmit suspension letters to the WVDOP). The Suspension Notice did not exceed WVDHHR's qualified privilege. This finding is consistent with decisions of West Virginia courts that have concluded that employers enjoy a qualified privilege when it comes to statements made during employer investigations into perceived wrongdoing. *Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 27-28 (W. Va. 2002). Because Plaintiff failed to make a factual showing sufficient to satisfy two essential elements of her defamation claim against WVDHHR, summary judgment must be granted. Syl. Pt. 1, *Crump*, 320 S.E.2d 70 at Syl. Pt. 1.; *Celotex*, 477 U.S. 317.

### ii. Plaintiff's Defamation Claim Against Whaley

In support of his summary-judgment motion, Whaley argued that Plaintiff failed to meet three essential elements of her defamation[3] claim: that Whaley made any defamatory statements; that Whaley's alleged communications were nonprivileged communications to a third party; and that Whaley published any such statements. (ECF No. 83 at 8.)

---

[3] Whaley also appears to move for summary judgment as to "Plaintiff's claim for punitive damages." (ECF No. 83 at 8.) However, a Plaintiff's prayer for punitive damages does not constitute a standalone claim under West Virginia law.

With respect to the latter element of publication, Whaley argues that, except for the DOH, all of the individuals at issue are either originators of the Suspension Notice rather than third parties, or the WVDOP who is entitled to the Suspension Notice by law. Plaintiff's response asserts that "publication" includes any transmission to a "third party." (ECF No. 97 at 13.) Thus, because the WVDOP is a "separate agency from DHHR," Plaintiff argued that transmission of the Suspension Notice constituted "publication." (*Id.* at 13-14.) Whaley argues that an employer may communicate with a separate entity so long as it has a "reasonable right to know" of the communication. (ECF No. 113 at 3-4.) Whaley's narrow reading of the publication element fails; a third party's "reasonable right to know" of the communication goes to whether a communication is nonprivileged. *See Adkins v. CSX Transp., Inc.*, 3:18-CV-0321, 2021 WL 3276602, at *5 (S.D. W. Va. July 30, 2021) (finding the employer and its managers were entitled to qualified privilege when publication of the statements were made "to protect or advance [its] own legitimate interests").

In response to the first two elements, however, Plaintiff merely recirculated her arguments regarding the three statements in the Suspension Notice discussed in Section III.B.i, *supra*. For the same reasons set forth therein, Plaintiff failed to make a factual showing sufficient to satisfy two essential elements of her defamation claim against Whaley, and summary judgment must be granted. Syl. Pt. 1, *Crump*, 320 S.E.2d 70 at Syl. Pt. 1.; *Celotex*, 477 U.S. 317.

### iii.  Plaintiff's Defamation Claim Against McKay

In support of her summary-judgment motion, McKay argued that Plaintiff failed

to meet three essential elements of her defamation[4] claim: that Whaley made any defamatory statements; that Whaley's alleged communications were nonprivileged communications to a third party; and that Plaintiff suffered any injury resulting from the allegedly defamatory statements. (ECF No. 83 at 8.) Plaintiff's response to McKay's motion relied on precisely the same arguments she raised as to WVDHHR and Whaley regarding the three statements in the Suspension Notice discussed in Section III.B.i and III.B.ii, *supra*, (*see* ECF No. 95). Therefore, for the same reasons set forth *supra*, Plaintiff failed to make a factual showing sufficient to satisfy two essential elements of her defamation claim against McKay, and summary judgment must be granted. Syl. Pt. 1, *Crump*, 320 S.E.2d 70 at Syl. Pt. 1.; *Celotex*, 477 U.S. 317.

## IV.  **RECOMMENDATION**

For the reasons stated herein, the undersigned respectfully **RECOMMENDS** that Defendants' motions for summary judgment (ECF Nos. 75, 83, and 79) be **GRANTED**.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown. Copies of any objections shall be provided to the opposing party

---

[4] Like Whaley, McKay also appears to move for summary judgment as to "Plaintiff's individual-capacity punitive damages claim." (ECF No. 75 at 20.) However, a Plaintiff's prayer for punitive damages does not constitute a standalone claim under West Virginia law.

or, if it is represented by counsel, to its counsel, and to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff and to transmit a copy to counsel of record.

ENTER:        February 4, 2022

Dwane L. Tinsley
United States Magistrate Judge